AMANDA WRIGHT ROGERSON (Idaho State Bar No. 9885)
DAVID J. CUMMINGS (Idaho State Bar No. 5400)
NEZ PERCE TRIBE
OFFICE OF LEGAL COUNSEL
P.O. Box 305
Lapwai, ID 83540
Office:  (208) 843-7355
Fax:      (208) 843-7377
amandar@nezperce.org
djc@nezperce.org

*Attorneys for Plaintiff Nez Perce Tribe*

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NEZ PERCE TRIBE, a federally recognized Indian Tribe,<br><br>　　　　Plaintiff,<br><br>　　　　　　v.<br><br>NEZ PERCE-CLEARWATER NATIONAL FORESTS SUPERVISOR CHERYL F. PROBERT; UNITED STATES FOREST SERVICE; NOAA FISHERIES REGIONAL ADMINISTRATOR WILLIAM STELLE; and NOAA FISHERIES,<br><br>　　　　Defendants. | Case No. 1:16-cv-00299<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>Violations of the Administrative Procedure Act (5 U.S.C. § 701 *et seq.*); the National Environmental Policy Act (42 U.S.C. § 4321 *et seq.*); the National Forest Management Act (16 U.S.C. § 1601 *et seq.*); and the Endangered Species Act (16 U.S.C. § 1531 *et seq.*). |

## INTRODUCTION

1.      Since time immemorial, Nez Perce Tribal members have fished and hunted elk in the Clear Creek watershed. The embattled fish and elk populations in this watershed are important treaty-reserved Tribal resources. The Tribe also co-manages the Kooskia National Fish Hatchery, which draws the bulk of its water from the Clear Creek watershed. The Hatchery is important to mitigate the harms to subsistence and sport fishing that have been caused by water developments in the Columbia River Basin.

2.      On December 17, 2015, the Forest Service issued a Final Record of Decision for the Clear Creek Integrated Restoration Project a massive timber project within the Clear Creek drainage. As the Tribe repeatedly pointed out during consultation and comment, the Forest's Final Record of Decision is riddled with errors and deficiencies:

> 1)  Inadequate analysis of risks to fish.  Excessive sediment devastates fish. Roads are one of the most significant sources of sediment. The Forest Service purported to analyze the sediment impacts of its proposed action in the Clear Creek drainage, but its sediment analysis was grotesquely inadequate. Among other things, the Forest systematically underestimated the width of roads in the Clear Creek drainage by approximately two-thirds; the Forest underestimated the total number of road miles within the Project area; and the Forest arbitrarily changed the "mitigation coefficients" it used to model total sediment production, with the result that it significantly underestimated the total increase in sediment flowing into the Clear Creek drainage as a result of the Project. NOAA Fisheries similarly erred in its assessment of the road-related sediment mitigation within the Project.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    2

2) Inadequate analysis of risks to elk. With significant help from the Tribe, the Forest Service has greatly improved its elk modeling capabilities. In 1984, the Forest employed a model, the "Leege guidelines," that did not take elk vulnerability into account. By 1997, as part of a settlement with the Tribe, it had developed a new model, the "Servheen model," that was able to analyze elk vulnerability. It has since progressed beyond even the Servheen model in developing accurate models of the impacts of projects on elk populations. Inexplicably, the Forest relied on the Leege guidelines in conducting its elk assessment for the Clear Creek Project. This contravened the best available science and the Forest's own Forest Plan. The decision was unlawful.

3.     The Tribe articulated these concerns and more during the planning-phases of the Project and worked assiduously to ensure that the Project was prosecuted thoughtfully and in accordance with applicable law. The Tribe is convinced, however, that its core concerns remain unaddressed and that the Project—and the Forest's and NOAA Fisheries' analysis of the Project—is deficient in crucial respects. Having exhausted its administrative remedies, the Tribe is left with no choice but to sue.

<u>**NATURE OF THE ACTION**</u>

4.     The Nez Perce Tribe brings this action pursuant to the Administrative Procedure Act ("APA") and alleges that the Forest Service's approval of the Clear Creek Integrated Restoration Project ("Clear Creek Project" or "Project") is arbitrary, capricious, and contrary to law.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    3

5.      The Clear Creek Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") violate the National Environmental Policy Act ("NEPA") because the Forest failed to take the requisite "hard look" at the Project's impacts to the environment, to use the best available science in its analysis of the Project, and to notify the public of incomplete and inadequate information used in the analysis.

6.      The Project's FEIS and ROD violate the National Forest Management Act ("NFMA") because the Forest failed to adhere to the requirements of the Forest Plan for the Nez Perce portion of the Nez Perce-Clearwater National Forests ("Forest").

7.      NOAA Fisheries' ("NOAA") Biological Opinion ("BiOp") on the Project violates the ESA because NOAA failed to use the best available scientific and commercial data.

8.      Consequently, Defendants' conclusions regarding the Clear Creek Project are arbitrary, capricious, and contrary to law. Plaintiff seeks judicial review and relief reversing and setting aside the Defendants' FEIS, ROD, and ESA consultations approving the Clear Creek Project, and issue an injunction to prevent the Forest from proceeding with the Project until it complies with NEPA, NFMA, and the Forest Plan standards.

<u>**PARTIES**</u>

9.      Plaintiff NEZ PERCE TRIBE is a federally recognized Indian Tribe headquartered in the town of Lapwai, Idaho on the Nez Perce Reservation. Since time immemorial, the Tribe and its Tribal members have used and enjoyed the lands which today bear the Tribe's name and are administered by the Forest Service as the Nez Perce-Clearwater National Forests.

10.      In 1855, the United States negotiated a treaty with the Tribe. Treaty of June 11, 1855, with the Nez Perces, 12 Stat. 957 (1859) (herein "1855 Treaty"). The Tribe, in Article III of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    4

the 1855 Treaty, reserved certain rights necessary to maintaining its culture and way of life, including the exclusive right to take fish in streams running through or bordering the Reservation, and "the right to fish at all usual and accustomed places in common with citizens of the Territory; and of erecting temporary buildings for curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed lands." Treaty of 1855, Article III.

11.     The Tribe, as a co-manager of its Treaty-reserved fisheries and wildlife resources, has a significant interest in the Forest Service's land management on all of the Forests where the Tribe retains off-Reservation Treaty rights. The lands and waters of the Nez Perce-Clearwater National Forests are among the areas where the Tribe exercises the off-Reservation fishing, hunting, gathering, and associated rights it reserved in its 1855 Treaty with the United States. The Tribe is especially interested in the Nez Perce-Clearwater National Forests' management of lands that may impact Tribal fisheries, wildlife, and cultural resources. Tribal members derive subsistence, recreational, aesthetic, scientific, commercial, cultural, and spiritual benefits from the Nez Perce-Clearwater National Forests and the fish naturally-produced in Clear Creek and its tributaries, the fish produced by the Kooskia National Fish Hatchery ("Kooskia Hatchery" or "Hatchery"), and from the existence of elk in the Clear Creek Project area.

12.     The present and future enjoyment of these resources by the Tribe is being, and will continue to be, irreparably harmed by the Forest Service proceeding with the Clear Creek Project when the Forest has failed to properly analyze the impacts of the Clear Creek Project on fish habitat, including ESA-listed fish habitat in Clear Creek, on the Kooskia Hatchery, and on elk populations.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                5

13.     Defendant CHERYL F. PROBERT is the Forest Supervisor for the Nez Perce-Clearwater National Forests, who signed the Project Record of Decision challenged here. She is sued in her official capacity for her actions as an employee of the United States Forest Service.

14.     Defendant UNITED STATES FOREST SERVICE is an agency or instrumentality of the United States, within the U.S. Department of Agriculture. As an agency of the United States, the Forest Service has Treaty and trust obligations to the Tribe. The Forest Service is also vested with the statutory authority and duty to manage and protect the public lands and resources of the Nez Perce-Clearwater National Forests at issue here.

15.     Defendant WILLIAM STELLE is the Regional Administrator for NOAA Fisheries who signed the Biological Opinion and Incident Take Statement challenged here. He is sued in his official capacity for his actions as an employee of NOAA Fisheries.

16.     Defendant NOAA FISHERIES is an agency or instrumentality of the United States, within the U.S. Department of Commerce. As an agency of the United States, NOAA Fisheries has Treaty and trust obligations to the Tribe. NOAA Fisheries is also vested with the statutory authority and duty to administer the ESA, including the ESA's Section 7 consultation provisions, in regard to threatened marine species, including steelhead, at issue here.

17.     Defendants' violations of law, as alleged herein, injure Treaty-reserved resources, subsistence, recreational, aesthetic, scientific, commercial, cultural, spiritual, and/or other interests of the Tribe. These are actual, concrete injuries caused by Defendants' violations of law, and the judicial relief sought would remedy, in whole or in part, the Tribe's injuries.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arose under the laws of the United States, including the APA, 5 U.S.C. § 701, *et seq.*; the NEPA, 42 U.S.C. § 4321, *et seq.*; the NFMA, 16 U.S.C. § 1601 *et seq.*; and the ESA, 16 U.S.C. § 1531, *et seq*.

19.     An actual, justiciable controversy now exists between Plaintiff and Defendants. The requested relief is therefore proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-06.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and the affected public lands and resources are located in this judicial district.

21.     Plaintiff has exhausted all required administrative remedies prior to bringing this action.

22.     The federal government waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## LEGAL FRAMEWORK AND STANDARDS

### Administrative Procedure Act

23.     As the NEPA, NFMA, and ESA do not provide a separate standard of review, the Forest's actions are reviewed under the standards of the APA. A court may "hold unlawful and set aside agency action, findings, and conclusions of law found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A) (1966). A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation

for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983). A court must perform a "thorough, probing, in-depth review" of agency action. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). Review may not "rubber stamp … decisions that [are] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89, 97 (1983). "Essentially, [a court] must ask whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Pacific Coast Fed'n of Fisherman's Ass'ns v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001).

Although "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency," the reviewing court's inquiry must be "thorough". *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). A reviewing court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 927 (9th Cir. 2007). Federal courts have recognized that "the presumption of agency expertise may be rebutted if the decisions, even though based on scientific expertise, are not reasoned." *Nat'l Wildlife Fed'n v. NMFS*, 2005 WL 1278878, at *4 (D. Or. 2005), *aff'd,* 524 F.3d 917 (internal quotation and citation omitted). A thoughtful summary of the relationship under the APA between agency deference and thorough judicial scrutiny of agency evidence and reasoning follows:

> There is no inconsistency between the deferential standard of review and the requirement that the reviewing court involve itself in even the most complex

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          8

evidentiary matters; rather the two indicia of arbitrary and capricious review stand in careful balance.  The close scrutiny of the evidence is intended to educate the court.  It must understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made.  The more technical the case, the more intensive must be the court's effort to understand the evidence, for without an appropriate understanding of the case before it the court cannot properly perform its appellate function.

*Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc).

### National Environmental Policy Act

24.     NEPA is America's basic "charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA serves two purposes: 1) "it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts;" and 2) it "guarantees that the relevant information will be made available" to the public so it may play a role in the decision-making process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

25.     Under NEPA, federal agencies must take a "hard look" at the environmental consequences of their actions before action is taken. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). Taking a hard look requires the agency to provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). The hard look doctrine bars "[g]eneral statements about 'possible' effects and 'some risk' . . . absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). This "ensures that important effects will not be

overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349.

26.     To fulfill the hard look requirement, agencies must prepare an Environmental Impact Statement ("EIS") (a comprehensive study of alternatives and environmental impacts) for "major Federal actions significantly affecting the quality of the human environment…" 42 U.S.C. § 4332(2)(C).

27.     When preparing an Environmental Assessment ("EA") or an EIS, the agency must provide adequate information on the baseline conditions of the affected environment. *See N. Plains Res. Council v. Surface Transp. Bd*, 668 F.3d 1067, 1083–85 (9th Cir. 2011). "Without establishing the baseline conditions which exist . . . there is simply no way to determine what effect the proposed [action] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

28.     An agency must also ensure that its NEPA analysis uses high quality information and accurate scientific analysis; an agency must also ensure that its NEPA discussion and analysis is based on professional and scientific integrity. 42 U.S.C. §§ 1500.1(b), 1502.24.

29.     In regard to NEPA's notice to the public requirement, the Draft and Final EIS provide assurances to the public that environmental concerns have been considered in the agency's decision-making process, "and, perhaps more significantly, provides a springboard for public comment..." *Robertson*, 490 U.S. at 349.

30.     An agency's NEPA actions, findings, and conclusions may be declared unlawful and be set aside under the APA's standards.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    10

## National Forest Management Act

31.     Under NFMA, the Forest Service must develop and regularly revise Forest Plans for each National Forest. 16 U.S.C. §§ 1604(a), (e), (g)(3)(B). Once a Forest Plan has been developed, all subsequent agency actions, including site-specific management activities, must be consistent with the governing Forest Plan. 16 U.S.C. § 1604(i).

32.     Courts do not hesitate to overturn the Forest Service's interpretation of its own Forest Plan if that interpretation is plainly erroneous or inconsistent with the Forest Plan's language. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012); *see also Forest Guardians v. United States Forest Serv.*, 329 F.3d 1089, 1098 (9th Cir. 2003) (court will reverse Forest Service's implementation of its own Forest Plan if that implementation is "plainly erroneous or inconsistent with the Forest Plan.") "An agency's position that is contrary to the clear language of a Forest Plan is not entitled to deference." *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005).

33.     An agency's NFMA actions, findings and conclusions may be declared unlawful and set aside under the APA's standards set forth above.

## Endangered Species Act

34.     The ESA is the nation's preeminent wildlife protection law. It was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species..." 16 U.S.C. § 1531(b). The ESA was "designed to *prevent* the loss of any endangered

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    11

species, regardless of the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 188 n.34 (1978) (emphasis in the original).

35.     Section 7 of the ESA requires that a federal agency, seeking to conduct an action that it authorizes, funds or carries out, ensure that the action does not "jeopardize" any ESA-listed species or result in the destruction or adverse modification of their critical habitat. The federal agency must fulfill this duty by conducting consultation with NOAA, pursuant to ESA Section 7(a)(2) and implementing regulations. *See* 16 U.S.C. § 1536(a)(2).

36.     NOAA is responsible for consultations regarding anadromous fish species, including salmon and steelhead. To fulfill Section 7(a)(2)'s mandate with regard to anadromous fish, the "action agency" must consult with NOAA if a proposed action "may affect" a listed species or its critical habitat. *Id*.; 50 C.F.R. § 402.14(a).

37.     To initiate consultation for a proposed action which may affect an anadromous listed species or its critical habitat, the action agency prepares a Biological Assessment ("BA") to evaluate the potential effects of the action on listed species and to determine whether a species or its critical habitat is "likely to be adversely affected" ("LAA") or "not likely to be adversely affected" by the action. 50 C.F.R. § 402.12. For LAA actions, the action agency must seek "formal" consultation with NOAA. 50 C.F.R. §402.14(a).

38.     Section 7 of the ESA requires that such consultation be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

39.     An agency's ESA actions, findings and conclusions may be declared unlawful and set aside under the APA's standards set forth above.

## STATEMENT OF FACTS

**I.     BACKGROUND**

**A.     The Tribe's connection to Nez Perce-Clearwater National Forests lands.**

40.     Since time immemorial, the Tribe has used the lands that today bear the Tribe's name and are administered by the Forest Service as the Nez Perce-Clearwater National Forests. These lands and waters of the Forest are part of the Tribe's vast aboriginal territory. These lands and waters are also among the areas where the Tribe exercises the fishing, hunting, gathering, and associated rights that the Tribe reserved in its 1855 Treaty with the United States.

41.     These Forest Service lands and waters provide irreplaceable habitat for Treaty-reserved resources, including big game species, such as elk, and imperiled stocks of Snake River steelhead, spring and summer Chinook salmon, bull trout, Pacific lamprey and other resident aquatic species.

42.     The Treaty-reserved right to take fish and other resources presumes the continued existence of these resources. *See Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 678–79 (1979).  Harm to these resources and their habitat harms the Tribe.

43.     Treaty Tribes, such as the Nez Perce, have been recognized as managers of their Treaty-reserved resources. *U.S. v. Washington,* 384 F. Supp. 312, 339-40, 403 (W.D. Wash. 1974). As a co-manager, the Tribe devotes substantial time, effort, and resources to the recovery and co-management of Treaty-reserved resources throughout its Treaty territory. The Tribe has an active role in restoring habitat, producing fish, monitoring fish harvest, and monitoring the fish

and big game populations in the Clearwater River Basin and, specifically in the Nez Perce-Clearwater National Forests.

44.     For many years, the Tribe's wildlife staff has worked to promote improved outcomes for the Tribe's Treaty-reserved wildlife resources by partnering with the Forest on major restoration planning efforts, participating in regional scientific collaborations, and developing and providing detailed comments on the Forest's numerous projects. Additionally, the Tribe's Watershed Division has partnered with the Forest to restore extensive habitat on Forest Service lands, as detailed further herein.

   **i.      The Tribe's watershed and restoration work on the Nez Perce-Clearwater National Forests.**

45.     The Tribe and the Forest Service have a long history of coordinating to complete restoration work on Forest Service lands. The Tribe's Department of Fisheries Resources Management, Watershed Division is most involved in these efforts. The partnership is a natural one, given the complimentary missions of the Tribe's Watershed Division and the Forest Service.

46.     The Watershed Division's mission is "one in which rivers and streams, the lifeblood in the veins of Nez Perce Country and the ecosystems they support, are healthy and valued…respected by all, and the land management activities ensure a sustainable balance with healthy ecosystems; only then will salmon, and all life, once again thrive, and the circle of life continue for all time." Nez Perce Tribe, Department of Fisheries Resource Management, *Mission Statement*, http://www.nptfisheries.org/Divisions/Watershed.aspx). Similarly, the Forest Service's mission is "to sustain the health, diversity and productivity of the Nation's forests and grasslands to meet the needs of present and future generations." USDA, U.S. Forest Serv., *What We Believe*, http://www.fs.fed.us/about-agency/what-we-believe.

47.     In 1996 the Tribe first approached the Forest Service with a proposal to jointly implement restoration projects with funds secured from Bonneville Power Administration. Given their shared mission to be good stewards of the environment, both entities realized more on-the-ground restoration could be accomplished if they worked together.

48.     In 1996 the Tribe first approached the Forest Service with a proposal to jointly implement six restoration projects with $716,807 secured from Bonneville Power Administration.[1] Given their shared mission to be good stewards of the environment, both entities realized more on-the-ground restoration could be accomplished if they worked together.

49.     From that point forward, the coordination efforts have continued: From 1997 through 2015, the Tribe and the Forest Service have worked in partnership and invested than $50 million to implement restoration projects.[2] Major accomplishments include: 175 aquatic barriers replaced or removed; more than 1,100 miles of road decommissioned; 34 miles of road improved; seven miles of stream channel restored; 120 habitat enhancement structures installed; 516,556 trees planted across 600 acres: 5,125 acres of noxious weeds treated: 31 miles of riparian protection fence maintained annually (protecting 1,115 riparian acres): and 18 miles of annual maintenance on the Nez Perce National Historic Trail.

50.     As recently as 2015, the Tribe implemented a watershed restoration program of $6,115,470 in partnership with Forests in Regions 1, 4, and 6. The Forests matched the Tribe's

---

[1] As reflected by Early Action Watershed projects that were contracted between Bonneville Power Administration and the Nez Perce Tribe's Department of Fisheries Resource Management, Watershed Division.

[2] As reflected by Habitat Restoration projects that were contracted between Bonneville Power Administration and the Nez Perce Tribe's Department of Fisheries Resource Management, Watershed Division, as recommended by the Northwest Power and Conservation Council.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    15

investment with $1,431,617.[3] Accomplishments included: Approximately 25 miles of road decommissioning; 15 aquatic passage barriers replaced opening 21 miles of habitat; two miles of in-stream restoration; 12 acres of floodplain restored; 50,158 trees planted; one acre of wetland restoration; 37 annual miles of riparian protection fence maintained (protecting 1,400 riparian acres); 18 annual miles of Nez Perce National Historic Trail maintained; and 847 acres of noxious weed treatment.

51.    The Forest Service has recognized the benefits of the partnership and the Tribe's work. As the Forest Service acknowledges on its website, after referencing the Tribe's Treaty-reserved rights, "[the] Nez Perce people still maintain strong ties with their homeland and work cooperatively with us as stewards of the precious forest resources."[4]

**B.    The Tribe's concerns regarding sediment impacts to natural spawning salmon and steelhead and Kooskia Hatchery operations.**

52.    The Forest's approach to the development of the Clear Creek Project is especially troubling against the backdrop of this history of partnership between the Tribe and the Forest Service.  Without meaningfully addressing or considering the Tribe's concerns, which the Tribe has pressed from early in the planning phase for the Project, the Forest has developed a project that poses a significant threat to the continued viability of both fish spawning habitat in the Clear Creek drainage and the Kooskia Fish Hatchery.

53.    Clear Creek drainage is already impaired spawning habit for salmon and steelhead. Since the 1930s, approximately 22 percent of Forest System land within the Clear Creek drainage

---

[3] As reflected and documented by Supplemental Project Agreements under the Master Participating Agreement 14-PA-11011700-048 between the Nez Perce Tribe and the Nez Perce Clearwater National Forests.
[4] *Tribal Relations,* NEZ PERCE-CLEARWATER NATIONAL FORESTS,
http://www.fs.usda.gov/main/nezperceclearwater/workingtogether/Tribalrelations (last visited June 28, 2016).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                      16

has been clear cut and approximately 190 miles of road has been constructed. FEIS at 3-12. Between 1960 and 2000, timber harvest in the drainage averaged approximately 3,900 acres per decade.  And between 2000 and 2009, about 1,400 acres were harvested in the drainage. FEIS at 3-74.

54.    As a result of these land use practices and the associated introduction of large amounts of sediment into the drainage, all of the sub-watersheds in the Clear Creek watershed have been rated by NOAA Fisheries as either functioning at risk or not properly functioning because of sediment. NOAA, Biological Op. (Dec. 17, 2015). The Forest in their 1987 Forest Plan also identified sediment as the primary limiting factor in the Clear Creek prescription watersheds.[5]

55.    The chronic sediment issues in Clear Creek have already seriously compromised the natural spawning of salmon and steelhead in the drainage.  Both Clear Creek's chronic sediment issues and its frequently elevated temperatures also threaten the successful operation of the Kooskia Fish Hatchery.

i.    **The Kooskia Fish Hatchery.**

56.    The Kooskia Fish Hatchery is located on Clear Creek, just upstream of its confluence with the Middle Fork Clearwater and ten miles downstream of the Forest and Project Boundary. Congress authorized the Kooskia Hatchery in 1961 to mitigate for lost Tribal and sport fishing opportunities in the Clearwater River as a result of water development projects in the Columbia River Basin.[6]  The Tribe has managed the Hatchery since 2007.

---

[5] "Prescription watershed" is an administrative designation and it is not a representation of actual hydrological watersheds within the Forest. Prescription watersheds are identified in Appendix A of the 1987 Nez Perce Forest Plan.

[6] U.S. Fish & Wildlife Service, *Kooskia Hatchery*, https://www.fws.gov/kooskia/ (Dec. 12, 2012).

57.     The importance of the Hatchery to the health and stability of the Clear Creek watershed cannot be overstated.   The Hatchery currently produces 600,000 juvenile spring Chinook salmon juveniles, annually. In addition, 635,000 spring Chinook salmon, 300,000 steelhead, and 675,000 coho salmon are produced by the Tribe, or by the Tribe in cooperation with the FWS and Idaho Department of Fish and Game at the other hatcheries in the Clearwater Basin (Dworshak Hatchery and Clearwater Hatchery), and released at Kooskia Hatchery and at the mouth of Clear Creek. The Hatchery is situated further up the Clearwater River than the other hatcheries, so fish returning to the Kooskia Hatchery extend the State and Treaty fishery past the other hatcheries.

58.     Adult salmon and steelhead returning from these releases are important contributors to sport, commercial, and Treaty fisheries from the mouth of the Columbia River up through the Snake and Clearwater rivers, and back to Clear Creek. There would be no sport fishing opportunities and no meaningful Tribal harvest without this hatchery production. The Hatchery fish releases are also mandated in the 2008-2017 *U.S. v. Oregon* Management Agreement, entered as an order of the federal District Court for the District of Oregon.

59.     The spring Chinook salmon that return to Kooskia Hatchery are trapped and used by the Hatchery for broodstock or are transported and released up Clear Creek to approximately two miles below the Forest boundary to spawn naturally in Clear Creek watershed, thereby supplementing the natural population of spring Chinook salmon. Broodstock fish provide eggs and sperm to propagate the subsequent generation of hatchery-origin fish at Kooskia, Dworshak, and Clearwater hatcheries in the Clearwater Basin. Because of its high returns, Kooskia Hatchery

provides almost 50 percent of the 3,800 adult spring Chinook needed for broodstock for all three hatchery operations in the Clearwater Basin.

60.     Steelhead adults returning to Clear Creek after release from the Kooskia Hatchery also extend the state and Tribal steelhead fishery upstream of Dworshak Hatchery. Returning steelhead adults are trapped at Kooskia Hatchery and used for broodstock or transported and released up Clear Creek to continue their spawning migration. Others are transported and released in the adjacent South Fork Clearwater River to supplement the natural spawning run there. These steelhead help provide for a Tribal steelhead fishery in both rivers.

61.     The Kooskia Hatchery is also crucial to the Tribe's coho salmon restoration program—a reintroduction program begun by the Tribe in 1994. The Hatchery is the primary broodstock collection location in the Clearwater Basin and provides important acclimation[7] for juvenile fish not reared at Kooskia Hatchery, but slated for release in Clear Creek. The Tribe recently invested over $300,000 to construct additional acclimation ponds at the Hatchery in order to expand capacity for coho salmon juveniles. In 2014, returns from this reintroduction project were for the first time large enough to conduct the first sport fishery for coho in the Snake River Basin in over 50 years.

**ii.     The Tribe's concerns regarding sediment impacts at Kooskia Hatchery.**

62.      The Clear Creek drainage accounts for approximately 90 percent of the water that the Hatchery needs in order to grow fish.[8]  Because the Clear Creek Project threatens to dump

---

[7] Acclimation is the process of rearing juvenile salmon in water from a location that the fish is targeted to return to. Juvenile salmon and steelhead go through a physiological change process just prior to migrating to the ocean.  During this process they imprint on the chemical signature of the water they are being reared in.  Therefore, fish are acclimated in the water they should imprint on and return to.
[8] The remainder of the water is supplied by wells.

untold quantities of sediment into the Clear Creek drainage, the Project poses grave risks to the continued successful operation of the Hatchery.

63.    Sediment is already a problem for the Hatchery. High spring stream flows move debris, rocks, sand, and silt in the Clear Creek watershed into Clear Creek and downstream. If not removed, this material blocks the Hatchery's intake entrance, preventing water from entering the Hatchery.  From the 1970s through the 1990s, so much sediment came down Clear Creek and into the Hatchery that Hatchery staff had to use a tractor to scoop dump-truck-loads of sand out of the rearing ponds. The intake structure also had to be cleaned out regularly—sometimes weekly—to prevent the water intake pipe from clogging shut.

64.    To protect the Hatchery from Clear Creek's high sediment loads, a diversion structure (an Obermeyer weir) was installed in 2008, at a cost of $797,114.  The weir allows coarse bedload to sluice past the intake structure but does not prevent the lighter suspended materials from entering the intake structure's screened chamber.  With the Obermeyer weir in place, the screened chamber (18' x 29' x 6') has to be cleaned out every six months.  This involves flushing approximately 4,176 cubic feet of sand and sediment through the Hatchery system to the settling pond on an annual basis.  This amount of sediment equates to about eight large dump-truck loads of sand and sediment.

65.    Since the Hatchery does not have an option to provide water from another location, and only has access to a limited amount of well water, a blockage in the intake structure, or a plume of sediment entering the Hatchery between October and May—when juvenile fish are being held or reared at the Hatchery—can lead to a loss of all fish being reared in the Hatchery. When

this happens, Hatchery staff must perform an emergency release of all fish into Clear Creek, regardless of their developmental stage.

66.     Even when Hatchery staff are effectively keeping sediment from blocking the Hatchery's water intake pipe, they cannot prevent the chronic lighter, suspended sediment in Clear Creek from entering the Hatchery. This lighter sediment works its way into fish holding areas where it must be swept out. High sediment loads entering the holding areas affect fish gills and cause environmental gill disease.

67.     As the Tribe emphasized throughout consultation and comment, the Forest has not taken the necessary or appropriate steps to ensure that the Project will not deposit terminal quantities of sediment in either Clear Creek's natural spawning habitat or directly into the Hatchery itself.



**C.    Clear Creek and its relationship to the Tribe's elk management efforts.**

68.    The Clear Creek watershed is an important elk hunting location for Nez Perce Tribal Treaty hunters. However, elk populations within the Clear Creek watershed are currently constrained by poor forage conditions, high motorized road densities, and other factors.

69.    As set forth in more detail below, the Tribe has spent the last 25 years attempting to improve the Forest's elk analysis due to its concerns about the Forest's use of "Guidelines for evaluating and managing summer elk habitat in northern Idaho" (Leege 1984) ("Leege guidelines") because of its lack of an elk vulnerability component.  In 1990, the Tribe entered into an agreement with the Forest Service regarding, in part, the Leege guidelines' lack of an elk vulnerability component. The result was Forest Plan Amendment No. 7 and the eventual development of Servheen et al., 1997 by the Nez Perce and Clearwater National Forests, Idaho Department of Fish and Game, and the Tribe. U.S.D.A. Forest Serv., Nez Perce Nat'l Forest Land and Res. Mgmt. Plan, Amendment No. 7 (Jan., 1990).

70.    The Tribe has continued to urge the Forest to use additional, updated science to model Project-related impacts to elk habitat in the Project area, such as science developed by staff at the Forest Service's own Starkey Experimental Forest and Range facility.

**D.    The development of the Project by the Forest and the Clearwater Basin Collaborative, and the Forest's use of the Tribe's fisheries and watershed restoration work.**

71.    The Clear Creek Project is the first landscape-scale project that the Forest and the Clearwater Basin Collaborative ("CBC") developed with Collaborative Forest Landscape Restoration Project ("CFLRP") funds for the Selway-Middle Fork Clearwater Collaborative Landscape Restoration Project area.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    22

72.     The Clear Creek Project is a product of the Nez Perce-Clearwater National Forests and the CBC.  The CBC was first convened on May 29, 2008, in an effort to coordinate the various interest groups in north-central Idaho and help them seek consensus regarding natural resource issues in the region. The Tribe was one of twenty original members of the CBC.[9] The original group also included representatives of Clearwater and Idaho counties, representatives of the forest products industry, parties with economic development interests, environmental and conservation organizations, and off-road vehicle groups.

73.     In 2010, the CBC and Forest collaborated to identify a high-priority landscape in need of a comprehensive restoration strategy. Together they identified the 1.4-million-acre Selway-Middle Fork ecosystem in north-central Idaho and submitted a restoration strategy—to be realized through individual restoration projects—to the CFLRP Advisory Committee.[10] This committee advises the Secretary of Agriculture in disbursing CFLRP funds—funds Congress has earmarked for ecological projects undertaken on National Forest Service land. The committee selected the CBC's and Forest's proposal for funding, known as the Selway-Middle Fork Clearwater Collaborative Landscape Restoration Project, in August of 2010.

74.     Consistent with the collaborative purpose of the CFLRP, partnerships or in-kind contributions are required to augment CFLRP funds, which can only cover 50 percent of the monitoring and ecological restoration costs for each proposal.

---

[9] The Nez Perce Tribe agreed to participate in, and honor the collaborative principles of the CBC to the extent consistent with the protection of its Treaty rights. The Tribe did not sign the CBC agreement or work plan.
[10] USDA, Forest Serv., *Collaborative Forest Landscape Restoration Program*, http://www.fs.fed.us/restoration/CFLRP/ (last visited June 30, 2016).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    23

75.     In 2010, the Tribe agreed to allow the Forest to use its fisheries and watershed restoration work in the Clearwater Basin as a match to receive CFLRP funds. The Tribe agreed its work could be used because it believed that the Selway-Middle Fork Clearwater Collaborative Landscape Restoration Project would be a restoration project. The Tribe's fisheries and watershed restoration work—including the costs to operate the Kooskia Hatchery—became an important source of matching funds for the Forest. Between 2010 and 2014, the Forest claimed approximately $5 million in Tribal fisheries work as matching funds in the CFLRP annual reports.

76.     The Forest plans to implement the Project on 43,731 acres of National Forest System land in the upper two thirds of the Clear Creek watershed. The Forest asserts that the Project will produce approximately 85 million board feet of timber harvested from 10,500 acres of forest. The Forest further asserts this timber is projected to sustain 2,133 jobs, generate $60,578,000 in community harvest income, and generate $9,097,000 in federal income tax. USDA, Clear Creek Integrated Restoration Project: Final Envtl. Impact Statement (Sept. 16, 2015) (herein "FEIS").

77.     The Forest scoped the Clear Creek Project between December of 2011 and March of 2012.  According to the Forest FEIS, the Project is expected to produce 85 million board feet of timber, harvested from 10,500 acres of forest. FEIS, Volume 2 at L-3. The proposal anticipates 4,156 acres of regeneration harvest, 331 acres of improvement harvest, 4,220 acres of commercial thinning, 1,793 acres of pre-commercial thinning, 1,371 acres of prescribed fire, and 41 acres of grass restoration. FEIS, Volume 1 at 3-146. In order to achieve the stated Project objectives, 36.3 miles of temporary road will be built, 119.8 miles of road will be reconstructed, 48.8 miles of road

will be reconditioned, and 13.2 miles of road will be decommissioned on land within the Clear Creek watershed. *Id.* at 3-147.

**E.     The Tribe's concerns with the Project, and the Tribe's efforts to ensure the Forest addressed these concerns.**

78.     The Tribe first became concerned about Project-related impacts, including the resultant increases in sediment in 2012 when it began ongoing, informal consultation with the Forest regarding the Project following the Forest's publication of its Notice of Intent ("NOI")[11].

79.     When the Forest released the Draft EIS for the Project in 2013[12], it became obvious to the Tribe that the Project would actually be detrimental to the fisheries resources in Clear Creek and its tributaries and to the Hatchery. On May 31, 2013, the Tribe submitted timely comments on the Project's Draft EIS, enumerating numerous concerns about the Project's impacts on Project area watersheds and fish habitat, on the Kooskia Hatchery, and its impacts to elk.

80.     On February 2, 2015, the Forest released its Final Environmental Impact Statement ("FEIS") for the Project. On February 13, 2015, the Forest also released its Draft Record of Decision ("DROD") for the Project.[13]

81.     Shortly thereafter, Tribal staff met with the Forest to discuss the FEIS and DROD.

82.     On February 24, 2015, the Tribe and Forest formally consulted on the Project. On March 12, 2015, several members of the Nez Perce Tribal Executive Committee, the governing

---

[11] The Forest Publish its first NOI on January 6, 2012, a second NOI on February 9, 2012, and a third NOI (updating the contact information and extending the comment period to March 1, 2012) on February 17, 2012.
[12] The Forest published a Notice of Availability ("NOA") in the Federal Register for the Project's draft Environmental Impact Statement ("DEIS") on April 19, 2013, and notice of the DEIS was published in the Lewiston Morning Tribune on April 23, 2013.
[13] Notice of the Forest's release of the FEIS and DROD was published in the Lewiston Morning Tribune on February 26, 2015.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    25

body of the Tribe, attended the Forest's Clear Creek field trip, although the trip did not include a visit to the Project area.

83.     On April 10, 2015 the Tribe filed a timely objection to the FEIS and ROD with the Forest. The Tribe's objection: 1) Raised concerns about the Project's impacts on Kooskia Hatchery; 2) Questioned whether the Project would result in a positive, upward trend in fish habitat carrying capacity; 3) Asked that the Project be redesigned to produce no short-term sediment increases; 4) Asked for an alternative water supply for the Hatchery to deal with short-term increases in sediment estimated by the Project; 5) Asked for turbidity monitoring at the Forest boundary; and 6) Stated the Tribe's concern about the Forest's use of a severely outdated model for evaluating Project impacts to elk habitat and the Forest's prediction that the Project would result in a decline in summer and winter habitat quality for elk. Nez Perce Tribe, Objection, Clear Creek Integrated Restoration Project FEIS and FROD (April 10, 2015).

84.     Pursuant to the applicable Forest Service regulations and procedures, the Tribe participated in an objection resolution meeting on May 20, 2015. Notably, at this meeting, the Tribe requested another meeting with the Forest to discuss the Forest's sediment modeling and to determine how the Project's sediment production could be reduced.

85.     David Schmid, Deputy Regional Forester, acting as the Objection Reviewing Officer, issued his final written response to the objectors on May 28, 2016. The response identified several deficiencies and errors in the FEIS and DROD, including inadequate documentation of an upward trend in prescription watersheds, and the need to incorporate the science used in the Servheen guidelines for evaluating elk habitat effectiveness. USDA, Forest Serv., Objection

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    26

Response to Clear Creek Integrated Restoration Project #15-01-00-0022, 0027, 0030 (May 28, 2015).

86.     Following the written response to objectors, the Forest updated their upward trend evaluation for watersheds within the Project boundaries. The Forest did not alter the Project.

87.     Tribal staff met with Forest staff on July 9, 2015 to review the Forest's updated upward trend evaluation. The Forest did not discuss the Forest's sediment modeling or how the Project's sediment production could be reduced.

88.     On July 30, 2015, the Tribe sent the Forest Service Chief Thomas Tidwell a letter detailing the Tribe's concerns about the Clear Creek Project and asking that the Forest Service refrain from making a final decision on the Project until the Tribe and Forest had cooperatively resolved the Tribe's concerns regarding Project-related impacts to fish and elk. The Tribe pointed out that despite numerous overtures by the Tribe, the Forest had declined to work with the Tribe to minimize sediment production or address elk habitat and vulnerability concerns.

89.     The Tribe asked Chief Tidwell to address the Tribe's four main concerns: 1) The Project's sediment production; 2) The lack of current condition data necessary to adequately address the Project's sediment impacts; 3) The lack of an alternative water source for Kooskia Hatchery to protect its operations from Project-related sediment impacts; and 4) The Forest's failure to use the best available science when evaluating the Project's impact on elk.

90.     On September 15, 2015, the Forest sent a letter to all planning participants updating them on the Project FEIS.  On September 16, 2015, the Forest released the Project's FEIS, with new information purporting to be responsive to the deficiencies identified by the Objection

Reviewing Officer Schmid in his final written response to objectors.  The Forest did not alter the Project.

91.    The Forest published notice of the FEIS in the Federal Register on September 25, 2015. The notice indicated that the review period ended on October 26, 2015.

92.    Acknowledging the need for an alternative emergency water source for the Hatchery, at the beginning of October 2015 the Forest suggested that the Tribe work with the Forest and the Natural Resources Conservation Service to apply for funding from the Joint Chiefs' Landscape Restoration Partnership. When the Tribe submitted a rough budget for the water source to the Forest, however, the Forest stated that it would not be able to secure enough funding from the Joint Chiefs' Landscape Restoration Partnership for the entire cost of the water supply and was only willing to apply for a portion of the funding needed. This would have left the water supply construction incomplete or would have required the Tribe to find additional funding.

93.    On October 27, 2015, the Tribe sent Forest Supervisor Cheryl F. Probert a letter pointing out that the onus is on the Forest to mitigate for the Clear Creek Project by funding an alternative water source for the Kooskia Hatchery and that it could not support a partial funding proposal.

94.    On November 24, 2015, NOAA issued a BiOp for the Project. NOAA then issued an updated BiOp on December 7, 2015 based on a "likely to adversely affect" ("LAA"), but no jeopardy, determination for steelhead. NOAA, Biological Op. (Dec. 18, 2015).

95.    On December 17, 2015, the Forest released its Final Record of Decision ("FROD") for the Project. The FROD chose "Alternative C" for implementation. This is the alternative with

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    28

the largest amount of harvest and the most acres harvested with regeneration treatments. USDA, Forest Serv., Final Record of Decision, ROD-1 (Dec. 18, 2015).

96.    The Forest released the FROD without meaningfully addressing the Tribe's concerns or complying with the Tribe's requests to better understand the Project and work towards reducing the Project's sediment production.

97.    Nevertheless, the Tribe continued to study the Project and continued to ask the Forest for a better understanding of the Project's sediment impacts.

98.    On February 22, 2016, three NPTEC members discussed the Tribe's concerns about the Clear Creek Project with Region 1 Forester Leanne Marten and her staff at a meeting in Missoula, Montana. The Tribe reiterated its desire to understand the NEZSED sediment model and sit down with the Forest to gain understanding about what portions of the Project would produce the most sediment, and how much that would be.

99.    At the February meeting, Deputy Regional Forester David Schmid agreed to set up another meeting with Region 1 and Forest staff to go over the sediment modeling with Tribal staff.

100.    On May 9, 2016, Forest and Region 1 staff met with the Tribe to discuss the Forest's NEZSED sediment modeling for the Project.  For the first time, the Tribe was given the underlying sediment model for the Project, with all of the data the Forest used.

101.    Because the Forest staff member who ran the NEZSED model for the Project was not present, Forest staff was not able to explain the NEZSED model to Tribal staff, or discuss which roads or harvest units were projected to produce the most sediment.  The Forest and Tribal staff did discuss the limitations of the NEZSED model, and that it was not a good predictor of sediment quantity. It was agreed that Tribal and Forest Service staff would meet again to discuss

the sediment modeling once the Forest was better prepared and had the appropriate staff present to do so.

102.    As a result of the Tribe's follow-up work to understand the Project and its impacts, Tribal staff discovered errors in the modeling the Forest used to predict current sediment production in the Clear Creek watershed and to predict Project-related sediment production. Tribal staff also discovered that the models that the Forest Service used to analyze Project-related sediment production did not utilize the best science available.

103.    Thus the Tribe, after participating in the CBC, consulting with the Forest Service on the Project informally and formally, holding many additional technical staff meetings, filing an objection to the Project within NEPA's timeline, and communicating its concerns to Forest Service Chief Thomas Tidwell and Forest Supervisor Cheryl F. Probert, concluded that its participation in the CBC had undermined the Forest's trust and Treaty responsibilities to the Tribe. The Forest was moving forward with the Project without regard to the Tribe's specific concerns. It also became clear that the Tribe's fisheries and watershed restoration work was being used by the Forest Service to fund a project that was counterproductive to the Tribe's fisheries and watershed work.

104.    The Tribe withdrew from the CBC on March 9, 2016. On March 23, 2016, the Tribe requested that the Forest Service stop using its fisheries and watershed restoration work as a partner-in-kind match for CFLRP funding. It also asked the Forest Service to remove the Tribe's fisheries and watershed restoration work as a match in CFLRP reports going back to 2012—the year the Tribe first raised concerns about potential impacts from the Project with the Forest, concerns that the Forest never addressed.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    30

105.    Consequently, the Tribe believes the Project should not proceed until the Forest accurately models the Project's sediment production and thoroughly analyzes the Project's actual impact on spawning habitat, the Kooskia Hatchery, and elk habitat and populations.

106.    The Tribe, as set forth above, exhausted every avenue in its effort to have the Forest address its concerns, from formally to informally consulting with the Forest on the Project, to attending many meetings with the Forest, to filing NEPA comments, to filing an objection with the Forest and participating in the objection resolution process, to communicating its concerns to Forest leadership. It appears to the Tribe that the only remaining means of addressing its concerns is through this lawsuit.

## II.    FLAWS IN THE FOREST'S ANALYSIS IN THE PROJECT'S FINAL ENVIRONMENTAL IMPACT STATEMENT AND RECORD OF DECISION, AND FLAWS IN NOAA'S ANALYSIS OF THE PROJECT'S BIOLOGICAL OPINION.

107.    The initial concerns the Tribe identified with respect to the impact of Project-related sediment production on spawning habitat and on Kooskia Hatchery operations and to elk habitat and populations remain valid.

108.    As the Project developed, the Tribe became increasingly concerned about Project-related sediment delivery to prescription watersheds within the Clear Creek watershed and to the Hatchery. Tribal staff also relayed its concern to the Forest that the already degraded prescription watersheds within Clear Creek would further degrade as a result of Project implementation, harming natural spawning fish.

109.    Similarly, throughout the planning stages for the Project, the Tribe raised its concern that the Forest was not adequately considering elk vulnerability because it was using outdated guidelines in its analysis. The Tribe repeatedly warned the Forest that the Project design

increased elk vulnerability and would likely counteract any predicted Project-related benefits for elk, such as increased forage production. At numerous meetings and in its comments on the Project, the Tribe asked the Forest to, at minimum, use the model incorporated into the Forest Plan, Servheen et al., 1997, which takes into account elk vulnerability when assessing habitat conditions. The Tribe also asked the Forest to consider using best available science to model Project-related impacts to elk habitat in the Project are—science developed by the Forest's own staff.

**A.     The Forest's analysis significantly underestimated current and future sedimentation in the Project area.**

110.    As a result of its error-riddled 2015 NEZSED model for the Clear Creek Project, the Forest underestimated the current volume of sediment that the Clear Creek Project area is producing and delivering to the Forest boundary. The Forest also substantially underestimated Project-related sediment production and delivery.

111.    The following graph depicts the Forest's erroneous NEZSED[14] modeling outputs for sediment delivery to the Forest boundary. The graph, which assumes that Project implementation took place in 2014, shows that the Forest's modeling for current sediment delivery and the spike in sediment delivery associated with Project implementation.

---

[14] Appendix A: An Implementation Guide to the Fish/Water Quality Objectives of the Nez Perce National Forest Plan," states "[i]n order to determine if the sediment yield guidelines are being met, it will be necessary to run the Forest's sediment yield model (NEZSED)." USDA, Forest Serv., Appendix A: An Implementation Guide to the Fish/Water Quality Objectives of the Nez Perce National Forest Plan, 16, (1991).



FEIS at 3-181.

112.    The errors in the Forest's NEZSED model for the Clear Creek Project caused it to underestimate current sediment delivery to the Forest boundary by two-thirds. The NEZSED model errors also caused it to dramatically underestimate the sediment spike that Project implementation will cause at the Forest boundary. Thus, the above graph should depict higher baseline sediment delivery and a higher spike. As a result of these two errors, the Forest has underestimated how much sediment will travel downstream and pass the Forest boundary as a result of Project implementation.

      i.     **The Forest arbitrarily used roadbed width instead of the disturbed area width in its road-related sediment calculations, thereby failing to account for approximately two thirds of an average road's sediment delivery area for all roads in the Project area.**

113.    The Forest used incorrect road widths in its NEZSED sediment calculations. Instead of using the total disturbed width (a road's total sediment-producing area), the Forest used

the traveled way width only (the roadbed width). The Forest's measurement fails to account for approximately two-thirds of an average road's sediment producing area.

114.    To model the total amount of sediment that a road will produce, one must take into account the total area disturbed by the road's construction. This area includes the cut and fill slopes, ditch lines, and the travel way and is measured by the horizontal distance from the top of the cut slope to the bottom of the fill slope, as depicted in the graphic below. (Appendix C to Forest Service's Watershed Database).



USDA Rocky Mountain Research Station, The Geomorphic Road Analysis and Inventory Package (GRAIP) Data Collection Method, 7 (2010).

115.    If the Forest had accounted for the entire disturbed area, as required by the NEZSED model, the Tribe believes the resulting calculated total of sediment production from roads would increase by approximately two thirds.

  **ii.**  **The Forest arbitrarily relied on a database with well-known inaccuracies to estimate the number of road miles in the Clear Creek watershed, even though it had other more reliable information at hand, thereby failing to potentially account for approximately one third to one half of the total road miles in the Project area.**

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF     34

116.   The Forest underestimated the total number of road miles within the Project area due to its complete reliance on inaccurate road information within the Forest Service Natural Resources Infrastructure Database ("INFRA").

117.   INFRA is a spatial database for buildings, dams, water systems, waste water systems, bridges, trails, roads, and recreation sites. The INFRA roads database contains information about roads including: road number, name, maintenance level, surface-type, number of lanes, road segment length, and road status.

118.   The road information contained in the Forest's INFRA database has come from a variety of sources over time including hand-drawn topographic maps, digitized and hand-drawn Mylar maps, and more current digital inputs. Because much of this data has been hand-entered, data entry errors exist. The programing languages and spatial projections within the INFRA database have also been changed over the years. These changes have introduced significant spatial errors into the roads data in the database.

119.   In some instances, INFRA, with its errors and limitations, is the most comprehensive source of roads data available. This is not the case, however, in the Clear Creek watershed.

120.   The laser Light Detection and Ranging ("LIDAR") data set and the Non-System Roads Inventory ("NSRI") protocol both provide a substantially more accurate picture of the location and number of road miles in the Clear Creek watershed than the INFRA database. The Forest has access to both.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    35

121.    LIDAR is a spatial Geographic Information System ("GIS") of road locations obtained during an overhead flight. LIDAR can be used to digitize roads based on the digital elevation model it produces.

122.    The road information contained in the NSRI protocol comes from actual ground-truthed, physical surveys of the LIDAR digitally-derived road data. NSRI functions to check the LIDAR-derived road data to ensure further accuracy.

123.    The Forest's own watershed database also contains Clear Creek watershed road information not contained in the INFRA database.  The Forest has not explained why it did not use LIDAR and NSRI when mapping the roads and determining the number of road miles in the Clear Creek watershed.

124.    To check the Forest's work, the Tribe completed a road miles analysis for the Hoodoo prescription watershed, the prescription watershed where the Project's first timber sale, Lost Mule, will take place. The Tribe compared the road miles the Forest derived from the INFRA database to the road miles contained in the LIDAR, NSRI, and INFRA databases.  Whereas the INFRA database alone showed 45.2 miles of road in the Hoodoo prescription watershed,  LIDAR, NSRI, and INFRA together showed approximately 84.4 miles of roads in the Hoodoo prescription watershed. The Forest's own watershed database documents 76 miles of roads in the Hoodoo prescription watershed.

125.    Because the Forest used the INFRA database alone to estimate road miles in the Clear Creek watershed, the Tribe believes it underestimated the number of road miles in the Hoodoo prescription watershed by at least one third when it ran the NEZSED model for the Project.

It is likely the Forest significantly underestimated road miles in the other Project area prescription watersheds as well.

> ### iii. The Forest increased mitigation coefficients for roads in the NESZED model for the Project without explaining the basis for the change, thereby arbitrarily decreasing the model's sediment estimates.

126.   The Forest also underestimated Project-related sediment production by increasing the mitigation factors associated with roads in the NEZSED model.

127.   Road erosion rates are determined within the NEZSED model for road segments by multiplying the land type's geologic erosion factor, the total area disturbed by the road, and the mitigation factor. Mitigation factors provide a percentage reduction in the total erosion rate for a road segment depending upon the intensity of mitigation measures applied. Thus, mitigation factors are multiplication factors within the NEZSED model that are intended to account for various road-related sediment mitigation measures.

128.   In 2011, while planning the Clear Creek Project, the Forest updated the guidance document that it uses to direct NEZSED modeling, "[t]he Implementation Guide to Appendix A of the Nez Perce National Forest Plan" ("2011 NEZSED implementation guide"). The mitigation coefficients for roads were significantly increased in the 2011 version from those that it used in the previous 1991 version of the NEZSED implementation guide.

129.   The increased mitigation coefficients in the 2011 guide are also reflected in the NEZSED model the Forest used for analyzing the Clear Creek Project.

130.   However, at no point did the Forest explain the basis for the changes in the 2011 NEZSED implementation guide or the Clear Creek Project NEZSED model. When the Forest made these significant, substantive changes to the assumptions built into the NEZSED model, the

Forest should have relied on a compelling, science-based rationale. Instead, it failed to provide any such rationale in the Project's EIS or elsewhere.

  **iv.**  **The Forest knowingly used inaccurate road data and used modeling designed to prioritize road segments for further surveying to predict road-related sediment delivery, thereby undermining the value and effectiveness of sediment mitigation for the Project Area.**

  131.  The Forest also failed to accurately identify which road segments within the Project area produced the most sediment and thus were in need of mitigation. This failure resulted from two specific errors: 1) as a result of its exclusive reliance on its INFRA database, the Forest used incorrect road data in its GRAIP-Lite model; and 2) the Forest misused the GRAIP-Lite GIS modeling tool by using it to identify high sediment producing road segments, when its intended and effective use is limited to prioritizing road segments for in-depth ground surveying (e.g. GRAIP surveys). Because of this failure, the efficacy of the Forest's mitigation measures was undermined.

  132.  The Tribe's Watershed Division staff warned the Forest that the INFRA data input into the GRAIP-Lite model was inaccurate. It also warned the Forest that using GRAIP-Lite to predict high sediment producing road segments was not the model's intended use. The Tribe recommended that the Forest use the GRAIP-Lite model only to prioritize road segments within the Project area for full GRAIP surveys.

  133.  The Forest used the GRAIP-Lite model outputs anyway to identify high sediment producing road segments within the Project area and to determine where to apply mitigation measures.  It also declined to conduct full GRAIP road surveys.

  134.  The Forest failed to disclose and explain these survey inaccuracies and modeling limitations in the FEIS.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    38

> **v.   The Forest arbitrarily relied on scientific literature written to address sediment mitigation in an area with radically different topography and soil type than that found in the Project area, thereby undermining the value of its mitigation measures.**

135.   In addition to misusing inaccurate modeling results to determine where sediment mitigation measures were needed, the Forest also used inapplicable scientific literature to determine the type of mitigation measures needed. The Forest relied in its FEIS on a study conducted in Virginia to conclude that cross drains should be the dominate mitigation tool used on Project-related roads to prevent sediment from entering Project area streams. Kristopher R. Brown, *Sediment Delivery from Bare and Graveled Forest Road Stream Crossing Approaches in the Virginia Piedmont*, 310, Forest Ecology and Management, Sept., 18, 2013 ("Brown et al., 2013 study"). It also relied on the Brown et al. 2013 study, to conclude that cross drains would mitigate 90 percent of Project-related sediment delivery to streams. USDA, Biological Assessment, Clearwater Creek Restoration Project, 40-41 (Sept. 3, 2014).



136.   The study was completed in the Virginia Piedmont, which has very different soil characteristics and topography, than Clear Creek. The Virginia Piedmont study area is composed

of sandy clay loam soils. Brown at 838. Clear Creek's soil composition is dominated by decomposed granite and basalt. The topography of the Virginia Piedmont is also characterized by rolling hills with side slopes ranging from eight percent to 25 percent. *Id*. The Clear Creek watershed, in contrast, is characterized by slopes up to 75 percent.

137.    Nowhere in the FEIS or ROD does the Forest explain why it considers the Brown et al., 2013 study relevant to the Clear Creek watershed.

138.    Due to its misguided reliance on a study completed in an area with radically different soil and topography, the Forest also cannot claim that its sediment mitigation prescription—cross drains—is appropriate and effective in the Clear Creek watershed.

>    **vi.    The Forest failed to use the supplemental modeling necessary to accurately quantify current and future sediment, therefore the Forest does not know the total Project-related sediment production, how much sediment can be prevented from entering streams through mitigation measures, and what the total sediment-related impacts from the Project will be.**

139.    Even if the Forest had used NEZSED or GRAIP-Lite effectively, these models alone cannot accurately quantify current sediment production or Project-related sediment production and thus are not sufficient for fully analyzing and understanding the efficacy of mitigation and sediment-related impacts.

140.    In order to accurately quantify Project-related sediment impacts, the Forest needed to supplement NEZSED and GRAIP-Lite with other available and more effective tools.

141.    Selection of a model is tied primarily to its intended use. Although NEZSED is the only model that can predict sediment on a watershed scale within the Nez Perce portion of the Forest, its predictions are course and not intended to be used to predict actual sediment yield and delivery to streams. FEIS at 3-152-53, 3-170.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    40

142.    To predict actual settlement yield, the Forest needed to use the Water Erosion Prediction Model ("WEPP") (2006) or the Geomorphic Road Analysis and Inventory Package ("GRAIP") (2010). Both models are available to the Forest. WEPP was developed in 2006 by the Agricultural Research Service, Natural Resources Conservation Service, Bureau of Land Management, and the United States Geological Survey; and GRAIP was developed in 2010 by the United States Forest Service Rocky Mountain Research Station and Utah State University.

143.    GRAIP is a better tool for understanding sediment production over a landscape and where that sediment is delivering to streams. NCASI, Tech. Bull. No. 988, *Comparison of Road Surface Erosion Models with Measured Road Surface Erosion Rates* (July 2011). GRAIP has the ability to incorporate base erosion rates collected at a local scale, and can provide the best estimates of sediment production and delivery to streams. Other tools such as WEPP are a logical choice to understand sediment production from an individual segment of road or a few segments of road.

144.    Because the Forest failed to supplement the NEZSED and GRAIP-Lite models with GRAIP and WEPP, it failed to accurately determine how much additional sedimentation the Project will create.  Even bracketing the Forest's other modeling errors, the Forest is thus singularly ill equipped to implement effective sediment-mitigation measures in the Clear Creek drainage.

**vii.    The Forest assigned an incorrect soil erosion factor to a significant number of harvest units in its NEZSED model, thereby underestimating sediment production from approximately 2,235 acres within the Project area.**

145.    In addition to dramatically underestimating road-derived sediment production in the Project area, the Forest also underestimated sediment production from a significant number of harvest units.

146.    In 1981, Regions 1 (Northern Region) and Region 4 (Intermountain Region) of the Forest Service issued the "Guide for Predicting Sediment Yields from Forested Watersheds," Cline et al. ("R1R4 guide"). Regions 1 and 4 promulgated the R1R4 guide in order to standardize the models that Forests in both Regions used to predict sediment yields.

147.    One of the ways the R1R4 guide standardized sediment models across the Regions was by standardizing the erosion factors—also known as system coefficients—that the forests used to predict sediment yield associated with various types of logging. Erosion factors are multiplication factors used within a model to help predict sediment production.

148.    This guide assigns different "erosion factors" to different harvest units based on (a) how many trees are going to be removed from the harvest unit (the prescription) and the means of removing the trees (*i.e.*, the logging or yarding system used). The guide assigns the highest erosion factor to "clear-cut" logging because it is the most erosive logging procedure.

149.    The Forest followed the R1R4 guide when it built the NEZSED model. Accordingly, the NEZSED model incorporates the R1R4 guide's erosion factors.

150.    When the Forest ran the NEZSED model for the Clear Creek Project, however, it failed to use the correct R1R4 erosion factor for all the harvest units it identified as regeneration cuts to be removed with a skyline logging system. The R1R4 erosion factor that should be assigned to skylined regeneration cuts is the factor that corresponds to skylined "clear-cuts" (0.33). But the Forest did not assign this erosion factor to these cuts; instead, the Forest assigned them the erosion factor that corresponds to a skylined selective harvest (0.29). The Forest therefore underestimated the amount of sediment that all skylined regeneration units within the Project area (approximately 2,235 acres) will produce.

151.   Both singly and in combination, the Forest's sediment analysis was woefully inadequate and dramatically underestimated both pre- and post-Project sediment production.  The Forest input grossly inaccurate data into its NEZSED model, arbitrarily adjusted the model's coefficients, failed to prioritize high sediment-producing segments of road for additional surveying, failed to rely on relevant scientific literature when selecting road mitigation measures, failed to use correct mitigation coefficients for harvest units, and failed to use appropriate models to quantify Project-related sediment production.

**viii.   The Forest arbitrarily relied on incomplete data to determine whether an upward trend analysis was required by the Forest Plan for certain prescription watersheds; therefore it did not complete all the upward trend analyses required by the Forest Plan.**

152.   Appendix A of the Forest Plan lists eight prescription watersheds that do not meet Forest Plan standards for water quality objectives due to sediment: Pine Knob Creek, Brown Spring Creek, Clear Creek, Solo Creek, Middle Fork Clear Creek, West Fork Clear Creek/Hoodoo Creek, Kay Creek and South Fork Clear Creek.  The Forest evaluated the current conditions of these watersheds and determined that currently, only three—Pine Knob Creek, Clear Creek and Middle Fork Clear Creek—do not meet Forest Plan standards, and thus would require an upward trend analysis under the Forest Plan.  FEIS, Appendix at J-1.

153.   The Forest used cobble embeddedness and percent surface fines by depth data to determine whether or not the Forest Plan water quality objectives were being met in the Project area's eight prescription watersheds. FEIS at 3-11. Cobble embeddedness is the degree to which fine sediments surround course substrates on the surface of a streambed.  Relatedly, percent surface fines is a measurement of the percentage of fine sediments on the stream bed as determined by size of the particles.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    43

154.    When determining whether two prescription watersheds—Kay Creek and South Fork Clear Creek—met Forest Plan water quality objectives, the Forest used data for percent surface fines by depth, rather than cobble embeddedness. The data the Forest used was collected in association with PIBO (Pacfish/Infish Biological Opinion) monitoring efforts.  The Forest states in the Project FEIS that percent surface fines of less than 21 percent equate to meeting the Forest Plan water quality objectives. The Forest then reports that in 2007 the surface fines for Kay Creek were 18 percent and in 2012, the surface fines for South Fork Clear Creek were 11 percent.  FEIS at 3-11.

155.    To conclude that Kay Creek and South Fork Clear Creek met Forest Plan water quality objectives, the Forest ignored its more recent PIBO data. The PIBO data in 2012 for Kay Creek was 49 percent and in 2015 for South Fork Clear Creek was 31.6 percent. Had the Forest used this more recent data, they would not be able to say that either Kay Creek or South Fork Clear Creek meet the Forest Plan water quality objectives. These creeks, like Pine Knob, Clear Creek and Middle Fork Clear Creek, would also require an upward trend analysis.

**ix.     The Forest arbitrarily relied on incomplete data in the upward trend analysis required by the Forest Plan for certain prescription watersheds, therefore it cannot accurately predict whether a trend is occurring in those watersheds, upward or otherwise.**

156.    The Forest is required to conduct an upward trend analysis on any prescription watersheds that do not meet Forest Plan standards.  To conduct such an analysis, the Forest must collect sufficient data both to establish a baseline habitat condition and to determine any change in that baseline condition.  The Forest has concluded that "[a] minimum of 5 years of data are necessary in order to establish baseline habitat conditions and determine relative change in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    44

condition at the permanent monitoring stations." USDA, Forest Serv., Nez Perce National Forest Plan Third Annual Monitoring & Evaluation Report, 37 (1990).

157.    For this Project, however, the Forest relied on just two data points for each of the three prescription watersheds that it determined needed an upward trend analysis and that data is widely separated in time:  for Pine Knob Creek, the Forest reported data from 1993 and 2012; for Middle Fork Clear Creek, the Forest reported data from 1988 and 2012; and, for Clear Creek, the Forest reported data were from 1993 and 2012. FEIS at 3-11.

158.    In the FEIS, the Forest admitted that this data was inadequate for the upward trend analyses it conducted, stating that "determining a trend for embeddedness based on two surveys may not be appropriate."   FEIS at 3-19. The Forest's arbitrary failure to use more than two data points means that it cannot accurately predict any trend in the prescription watersheds in which it is required to conduct an upward trend analysis.

159.    For the upward trend analyses in this Project, however, the Forest has virtually no data. The Forest describes only two data points for each of the three prescription watersheds that it determined needed an upward trend analysis and that data is widely separated in time:  for Pine Knob Creek, the Forest reported data from 1993 and 2012; for Middle Fork Clear Creek, the Forest reported data from 1988 and 2012; and, for Clear Creek, the Forest reported data were from 1993 and 2012. FEIS at 3-11.

160.    In the FEIS, the Forest admitted that this data was inadequate for the upward trend analyses it conducted, stating that "determining a trend for embeddedness based on two surveys may not be appropriate." FEIS at 3-19.  The Forest's arbitrary failure to use more than two data

points means that it cannot accurately predict any trend in the prescription watersheds in which it is required to conduct an upward trend analysis.

      **x.**    **The Forest's interpretation of Forest Plan's upward trend mandate, and its exceedingly general description of watershed conditions that could indicate an upward trend, are clearly erroneous because they are contrary to the restorative purpose of mandate.**

161.    The Forest's interpretation of the Forest Plan's upward trend mandate is plainly erroneous.

162.    In order for timber management to occur in prescription watersheds not meeting Forest Plan water quality objectives, Appendix A of the 1987 Forest Plan requires that an upward trend *in habitat carrying capacity* be indicated. Appendix A specifically states: "Sediment is the primary limiting factor in these streams. Improvements will be scheduled between 1986 and 1995. Timber management can occur in these watersheds, concurrent with improvement efforts, *as long as a positive, upward trend in habitat carrying capacity is indicated*." Forest Plan, Appendix A; FEIS at J12, J-20, J-29.

163.    The upward trend mandate was included in the 1987 Forest Plan in order to ensure that prescription watersheds degraded by past timber management activity began to show improvement. Almost thirty years later, sediment continues to be the primary limiting factor in these watersheds.

164.    The ongoing, degraded nature of prescription watersheds in the Clear Creek watershed is likely attributable to the Forest's working interpretation of the Forest Plan's upward trend mandate. The Forest spelled out its interpretation of the upward trend mandate in its 2011 NEZSED implementation guide and, again, in the Clear Creek Project's FEIS. FEIS at 3-16:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF        46

1) An upward trend means that stream conditions that are below the Forest Plan objective will move toward the objective over time;

2) It must be demonstrable that an improving trend is either in place and will continue, or that an improving trend will be initiated as a result of past, present and future management activities;

3) That the Forest Plan did not specifically intend that the improving trend be in place prior to initiation of new activities; and

4) In previously degraded watersheds, especially those identified as below objective in 1987, if there have been no entries or natural disturbances over the past 10 to 20 years, it could be assumed that trend is either static or improving. FEIS at 3-16.

The Forest also stated the conditions in which it thought an upward trend could be found:

It was assumed in the Forest Plan that implementation of instream restoration and other watershed restoration activities would result in an upward trend in carrying capacity. Where these activities have been implemented, it could be stated that an upward trend in the habitat conditions has been accomplished.

*Id*. at 3-17.

165.    Both the Forest's interpretation of the upward trend mandate, and its exceedingly general description of watershed conditions that could indicate an upward trend, are clearly erroneous because they are contrary to the restorative purpose of the upward trend mandate.

166.    First, the Forest's statements that, "the Forest Plan did not specifically intend that the improving trend be in place prior to initiation of new activities" and "[i]t must be demonstrable that an improving trend is either in place and will continue, or that an improving trend will be initiated as a result of past, present and future management activities" provides no time period in which an upward trend must be shown and thus no limit on further degrading activities, such as

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    47

timber management. FEIS at 3-16. According to the Forest's interpretation, if a trend is not already in place, it must simply show that one will be initiated at *some point* through "past, present *and future* management activities" (emphasis added). *Id.* Under this interpretation, the point at which an upward trend was established could always be in the future. Accordingly, the Forest's interpretation offers no guarantee that degraded watersheds will ever recover, the clear goal of the upward trend mandate.

167.    The only logical interpretation of the Forest Plan's language—"[t]imber management can occur in these watersheds, concurrent with improvement efforts, *as long as a positive, upward trend in habitat carrying capacity is indicated"*—is that prescription watersheds must show an improvement *before* initiation of new timber management activities. *Id.* at 3-160. (emphasis added). The presence of an upward trend is a clear condition precedent of timber management.

168.    Second, the Forest's statement that "in previously degraded watersheds, especially those identified as below objective in 1987, if there have been no entries or natural disturbances over the past 10 to 20 years, it could be assumed that trend is either static or improving" does nothing to help the Forest determine whether an upward trend is present in degraded prescription watersheds. *Id.* at 3-16. According to the Forest, a lack of management entries simply suggests that the watershed's habitat trend is *either* "static" or "improving." Moreover, there is nothing in the Forest's statement to suggest or defend the idea that a static trend should be understood as an upward trend.

169.    According to Merriam Webster Dictionary, "static" is defined as "showing little or no change, action, or progress." Merriam-Webster.com 2016, http://www.merriam-webster.com

(last visited June 4, 2016).  In turn, "positive" is defined as "contributing toward or characterized by increase or progression" and as "affirming the presence especially of a condition, substance, or organism suspected to be present." *Id.* Finally, "upward" is defined as "toward a higher or better condition or position." *Id.*

170.    It is also useful to note that the meaning of "static" is at odds not only with the meanings of "positive" and "upward" but also with the meaning of "trend" which is defined as "to show a tendency" and to "to extend in a general direction" or "follow a general course." *Id.* Because something static is showing little or no change, action, or progress, it is difficult to imagine "a static trend." "A static trend" is also at odds with Forest Plan's plain language describing an upward trend as "a positive, upward" trend.

171.    Third, the Forest's interpretation of the conditions in which an upward trend can be found is also erroneous.

172.    The Forest relies on the idea that its instream restoration or other watershed restoration activities will result in an upward trend in carrying capacity to conclude that an upward trend exists in Clear Creek's degraded prescription watersheds. The Forest cites to road mitigation measures such as graveling and culvert replacement, road decommissioning, "relatively little" past timber harvest activity in the Clear Creek watershed, and intact riparian areas. The Forest concludes that "[a]ll these factors combine to indicate that there is an overall upward trend in aquatic habitat carrying capacity on Forest managed lands in Clear Creek." FEIS at 3-17.

173.    It belies common sense to simply assume that an upward trend is occurring in a degraded prescription watershed where *any* instream or watershed restoration activities have occurred, regardless of what other management activities have taken place. The prescription

watersheds in Clear Creek alone disprove this misguided assumption. Over the last 30 years, the Forest has completed substantial road decommissioning and road maintenance work in Clear Creek watersheds. This work has not been enough, however, to overcome the damage done by years of logging and road building. The watersheds remain below Forest Plan water quality objectives.

174.    In the Clear Creek FEIS the Forest states that there has been "relatively little" timber harvest activity in the Clear Creek watershed. FEIS at 3-17. This admission prevents the Forest from relying on its own generalized assumption that, "if there have been *no* entries or natural disturbances over the past 10 to 20 years, it could be assumed that trend is either static or improving" (*emphasis added*). *Id.* at 3-19. Because, in fact, there has been timber harvest activity, 1,400 acres in fact, between 2000 and 2009, i.e. "entries". Therefore, following the Forest's own logic, it cannot be assumed that the trend is either static or improving. Instead, the opposite must be assumed: Habitat conditions in the degraded prescription watersheds are actually static *or* declining.

175.    The Forest Plan standard requires a "positive, upward trend in habitat carrying capacity" in order for timber management activities to occur in prescription watersheds. Forest Plan, Appendix A at A-7. The Forest has no scientific proof that such a trend is occurring. Moreover, interpreting the Forest Plan to allow for timber activities in prescription watersheds degraded by previous logging activity *before* an upward trend has been established— and without requiring a specific point in time at which an upward trend must be shown—is a recipe for the chronically degraded watersheds we see in Clear Creek today.

176.    The Forest's 2011 interpretation of upward trend constitutes an end run around the clear intent of the upward trend mandate. As such, it represents a post hoc rationalization for management activities in prescription watersheds that have never recovered from past timber management activities.

xi.    **The Forest's lack of compliance with Forest Plan requirements through its ongoing failure to release required annual monitoring reports.**

177.    The Forest has repeatedly failed to release annual Forest Plan monitoring reports as required by the 1987 Forest Plan.

178.    The Forest Plan requires the Forest to develop an annual monitoring program in accordance with its monitoring requirements. Forest Plan, Chapter V, Table V-1, V-6-V-7.  The Forest Plan also requires the Forest to annually evaluate the results and trends from its annual monitoring in a separate report. Id. at V-4-V-6. The Forest has, however, repeatedly failed to conduct the monitoring the Forest Plan requires in Table V-I or to release an annual report documenting that monitoring for the past twelve years. The Forest's last report was issued in 2004. This failure is a violation of the Forest Plan and has precluded adequate environmental analysis of the Clear Creek Project.

179.    For instance, the Forest has failed to annually (or even regularly) monitor cobble embeddedness—an important measure of water quality—in prescription watersheds. This failure led to a lack of adequate data to determine current conditions in the Clear Creek Project area, and thus has precluded the Forest from making accurate upward trend determinations, as required by Appendix A to the Forest Plan.

180.    Further, amendments to the Forest Plan's monitoring requirements associated with elk habitat management were not implemented, resulting in the use of outdated and discredited

methodologies, as discussed herein above. Annual reports also may have highlighted data and modeling deficiencies associated with other wildlife indicator species and compliance issues associated with the Forest Plan's numerous habitat protection standards.

181.    Table V-1 of the Forest Plan includes specific monitoring relevant to the Forest's Clear Creek Project decision, ranging from evaluations of fish habitat to the impacts of roads or management activities.[15]

182.    If the failure to issue annual monitoring reports is due to a lack of funding, the Forest has failed to compensate by developing a further course of action—a requirement of the Forest Plan should lack of funding prevent the required monitoring. Forest Plan, Chapter V, V-5. Instead, the Forest has continued to issue implementation schedules and to carry out projects in violation of the Forest Plan's annual monitoring requirements.

**F.    The Tribe's concerns regarding Project-related impacts to elk.**

183.    The Clear Creek watershed is an important elk hunting location for Nez Perce Tribal members. However, elk populations within the Clear Creek watershed are currently constrained by poor forage conditions, high motorized road densities, and other factors.

184.    Throughout the planning stages for the Clear Creek Project, the Tribe raised its concern that the Forest was not adequately considering elk vulnerability because it was using the outdated "[g]uidelines for evaluating and managing summer elk habitat in northern Idaho" (Leege 1984) in its analysis ("Leege guidelines"). The Tribe repeatedly warned the Forest that the Project

---

[15] Specifically including: Acres/number fish habitat improvements; soil and water rehabilitation and improvements; fish habitat trends by drainage; impacts of management activities on water quality; effectiveness of specific water quality mitigation measures; impacts of management activities on riparian areas; acres of big-game habitat improvements; big-game habitat carrying capacity; nongame habitats; population trends of indicator species-- wildlife and fish; validation of resource prediction models; wildlife, water quality, fisheries, timber; and the maximum size of opening for harvest units. *See* Table V-1 of the 1987 Forest Plan. See Forest Plan, Chapter V, V-1.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    52

design increased elk vulnerability which would likely counteract any predicted Project-related benefits for elk, such as increased forage production.

185.   At numerous meetings and in its comments on the Project, the Tribe asked the Forest to, at a minimum, use the model incorporated into the Forest Plan, Servheen et al., 1997, which better accounts for elk vulnerability when assessing habitat conditions. The Tribe also asked the Forest to consider using better available science to model Project-related impacts to elk habitat in the Project area—science developed in part by staff at the Forest Service's own Starkey Experimental Forest and Range facility.

186.   The Forest ignored the Tribe's repeated requests, the Forest Plan standard, and the availability of better science when assessing Project-related elk impacts. Instead, the Forest released the FROD after only using an updated version of the Leege guidelines to analyze Project-related impacts to elk during summer. Consequently, the Forest completely failed to take into account impacts to elk vulnerability from human disturbance during hunting season when analyzing the Project.

187.   The Forest's decision to rely on the updated Leege guidelines is inexplicable.  In 1990, the Tribe and the Forest entered into an agreement to replace the Leege guidelines with a model that included an elk vulnerability component.  The Forest's intransigence with regard to assessing elk vulnerability is deeply frustrating to the Tribe. This is largely because the Tribe has spent the last 25 years attempting to improve the Forest's analyses of project-level impacts to elk.

188.   The Tribe made an agreement in 1990 with the Forest Service regarding, in part, lack of an elk vulnerability component in the Leege guidelines. The result was Forest Plan Amendment No. 7 and the eventual development of "[i]nteragency guidelines for managing elk

habitats and populations on United States Forest Service lands in central Idaho" by Servheen et al., 1997 ("Servheen guidelines") by the Nez Perce and Clearwater National Forests, Idaho Department of Fish and Game, and the Tribe.

189.    The Forest's continued reliance on the Leege guidelines—which the Tribe previously challenged in 1990 and worked to replace in the mid-1990s—left the Tribe with little choice but to sue to protect its Treaty-reserved elk resources.

> **i.      The Forest failed to follow its Forest Plan standard in assessing of the Project's impacts on elk vulnerability, therefore potential impacts to elk populations within the Project area are unknown and cannot be compared across management alternatives.**

190.    Over the past several decades, the Tribe has become intimately familiar with the tools the Forest Service uses to assess and manage elk habitat on the Forest.

191.    In 1988, the Tribe appealed the Forest's October 1987 ROD adopting the Forest Plan. The Forest Plan required use of the Leege guidelines to manage for and assess the attainment of summer elk habitat objectives in project evaluations. Forest Plan, Wildlife and Fish Standard No. 6, II-18.

192.    The Tribe appealed because it believed in 1988, and continues to believe, that the Leege guidelines for assessing Project-related impacts to elk habitat are inadequate. Specifically, the Tribe believes that the Leege guidelines fail to adequately take into account elk vulnerability and measure elk habitat effectiveness when assessing habitat conditions.

193.    As a result of the Tribe's 1988 appeal of the Forest Plan, the Forest Service agreed to modify the Forest Plan by way of amendment on January 2, 1990. The resulting amendment, Amendment No. 7, mandated, among other things, an update to the elk habitat effectiveness model contained in the Leege guidelines as well as its use: "Model changes and refinements will be

incorporated into the Nez Perce Forest version of the elk effectiveness model, and the amended version of the model will be used in future forest planning." Forest Plan, Amendment No. 7 at 1.

194.    In February 1992, a research team comprised of representatives from the Nez Perce and Clearwater National Forests, Idaho Department of Fish and Game, and the Tribe came together to address shortcomings in the Leege guidelines and related elk management concerns on the Forest.  In December 1997, the team finalized and published a revision of the Leege guidelines. The Servheen guidelines updated the assumptions, rules, and recommendations in the Leege guidelines, as mandated by Forest Plan Amendment No. 7.

195.    Although the Servheen guidelines improved on the Leege guidelines in several areas, the two stated purposes for developing the Servheen guidelines were to standardize and update the measure of elk habitat effectiveness contained in the Leege guidelines and to devise and implement an improved measure of elk vulnerability—a recognized shortcoming of the original elk habitat effectiveness model.

196.    The original elk habitat effectiveness model contained in the Leege guidelines attempted to account for elk vulnerability concerns by including a metric for closed roads during elk hunting season directly within the elk habitat effectiveness model. The resulting model was designed to be applicable from April through December (i.e. prior to, during, and after elk hunting season).

197.    The Servheen guidelines recognized that both the effectiveness of elk habitats and the vulnerability of elk populations were important yet separate elk management issues. The updated elk habitat effectiveness model contained in the Servheen guidelines focused on habitat attributes during summer by dropping reference to closed roads during hunting season. The elk

vulnerability model contained in the Serveen guidelines focused on balancing hunter and motorized route densities during the fall rifle hunting season to meet elk population objectives. The only common element shared by both models is the impact of motorized human disturbance. The scientific literature provides ample evidence that elk security is heavily degraded in proximity to motorized routes in areas where hunting is permitted.

198.    Both the updated elk habitat effectiveness and elk vulnerability models contained in the Serveen guidelines were intended to be used in concert to refine and amend the single elk habitat effectiveness model contained in the Leege guidelines. The updated elk habitat effectiveness model dropped reference to road status during hunting season and was intentionally re-focused on the pre-hunting season. The assessment of elk vulnerability, including motorized route status during hunting season, was shifted to the complementary elk vulnerability model. Neither was intended for use as a stand-alone model, as each refined distinctly different portions of the original model contained in the Leege guidelines.

199.    Despite the fact that the Forest adopted Amendment No. 7 in the wake of the Tribe's Forest Plan appeal, and then worked with the Tribe to develop the Serveen guidelines, the Forest refused to use the Serveen guidelines' elk vulnerability model.  Instead of relying on guidelines adopted by reference into its own Forest Plan, the Forest arbitrarily and inexplicably relied on guidelines proposed by Hillis et al. (1991) prior to the development of the Serveen guidelines ("Hillis guidelines").  The Hillis guidelines are older than, and inferior to, the Serveen guidelines; among other things, they do not account for hunter numbers and they likely overestimate the size of security areas available to elk.  No justification has been or can be given for the Forest's arbitrary decision to use the Hillis guidelines instead of the Serveen guidelines.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    56

200.    This is not the first time the Forest has failed to use the Servheen guidelines as required by the Forest Plan. The Servheen guidelines were also not fully utilized in the following Projects on the Nez Perce-Clearwater National Forests: American and Crooked Rivers Timber Salvage (2005), Blacktail Hazardous Fuels (2008), Adams Camp Wildfire Protection (2013), Johnson Bar Fire Salvage (2016), and Designated Routes and Areas for Motor Vehicle Use (decision pending).

201.    Notably, in 2015, the U.S. District Court for the District of Idaho found that Forest Service acted in an arbitrary and capricious manner by failing to use the Servheen guidelines in place of the severely outdated Leege guidelines for a project on the Clearwater Forest, explaining: "To accept the Forest Service's conclusion would be to allow analysis and reasoning be made in a time-warp as if nothing has changed since 1987 when the guidelines for measuring the very data at issue have clearly and indisputably changed." *Friends of the Clearwater v. U.S. Forest Serv.*, No. 3:13-CV-00515-ELJ, Memorandum Decision and Order at 22 (D. Idaho Mar. 11, 2015).

202.    Failure to make use of the elk vulnerability model contained in the Servheen guidelines is a critical omission because impacts to elk vulnerability appear likely to occur as a result of this Project. The road network in many parts of the Project area is extensive, making the Project area readily accessible to the hunting public and likely leading to high hunter densities during rifle elk season.  These impacts are likely to undermine any benefits the Forest has identified for elk, such as increased forage production, arising from this Project. Without a proper assessment of the Project's impact to elk vulnerability during this critical time of year, potential impacts to elk populations within the Project area cannot be known and compared across management alternatives.

ii.     **The Forest relied on outdated methods superseded by the Forest Service's own research and local planning efforts when assessing the impacts of the Project on elk habitat and vulnerability, thereby failing to use best available science in its analysis.**

203.    The Forest failed to use the best available science when assessing the impacts of the Clear Creek Project on elk habitat and vulnerability.

204.    Although the Servheen guidelines contain better tools than the Leege guidelines for assessing Project impacts to summer elk habitat effectiveness and fall elk vulnerability, better approaches have been developed since the Servheen guidelines were published in 1997.

205.    In fact, a number of peer-reviewed studies have been published in the years since 1997 investigating the direct, indirect, and cumulative effects of roads, motorized recreation, forage quality, invasive weeds, livestock grazing, predation, hunting pressure, and other factors on elk habitat and elk vulnerability. Many of these studies have been conducted and published by Forest Service research staff located at the Starkey Experimental Forest and Range near La Grande, Oregon. As a result of this research, a number of important management concerns and analysis considerations have been identified since 1997 relevant to the Clear Creek Project.

206.    On the basis of some of these studies, the Forest itself developed an updated method to evaluate elk vulnerability as part of its internal Forest Plan Revision process in August 2006. The Forest's 2006 Evaluation Report—Terrestrial Wildlife Habitat document ("Evaluation Report") used peer-reviewed literature from 1991-2005 to develop an updated analytical tool superior to that contained in the Servheen guidelines. The Evaluation Report also re-mapped elk winter range across the Forest, information that is used and cited by the Forest in the Clear Creek FEIS. FEIS at 3-237.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    58

207.    The Evaluation Report acknowledges well-documented concerns associated with using road densities, the metric used by both the elk habitat effectiveness and elk vulnerability models contained in the Servheen guidelines, to evaluate the impact of roads on elk habitat. As recommended by recent research, the Evaluation Report instead makes use of a distance-banding approach that accounts for the spatial configuration of motorized routes and the avoidance of those routes by elk.

208.    The Forest's evaluation of elk impacts associated with this Project relied on outdated methods superseded by the Forest Service's own research and local planning efforts.  Use of more recent research results and updated analytical tools, including the Forest Service's and Forest's own work products, would have provided a more appropriate basis for evaluating the impacts of the Clear Creek Project on elk habitat effectiveness and vulnerability.

**G.    NOAA's reliance on the Forest's erroneous modeling results and inapplicable scientific literature.**

209.    NOAA relied on the Forest's erroneous GRAIP-Lite modeling outputs and inapplicable scientific literature in its BiOp and Incidental Take Statement ("ITS"), rendering its BiOp/ITS arbitrary, capricious, and contrary to law.

210.    The Forest's Biological Assessment ("BA") documents its use of the GRAIP-Lite application in NetMap to identify road segments where sediment delivery is highest. The BA also documents the Forest's proposed mitigation activities, including installing cross drains and resurfacing roads, at those locations identified as moderate to high sediment producers.

211.    Additionally, the Forest cites the Brown, et al., 2013 study in its BA when discussing its decision to install additional cross drains in the Clear Creek watershed, and to support its conclusion that its mitigation activities will reduce long-term, chronic sediment delivery

from roads to streams in the Project area by at least 90 percent. USDA, Biological Assessment, Clearwater Creek Restoration Project, 40-41 (Sept. 3, 2014).

212.    As explained earlier, the Forest's GRAIP-Lite modeling outputs were extremely inaccurate and should not have been relied on. The Forest's reliance on Brown, et al., 2013 is also problematic because of its inapplicability to Project area soil types and topography.

213.    Due the NEZSED model's inability to predict sediment yield with precision, NOAA determined in its BiOp that it was important to "examine more closely how well the specific activity components of the action are likely to reduce existing sediment delivery and avoid/minimize additional delivery." NOAA, Biological Op., 58, 67 (Dec. 18, 2015) ("BiOp"). NOAA also stated in the BiOp that "[a]ttention to the road segments that are actively delivering sediment to streams is critical to improving substrate conditions in the Clear Creek watershed." *Id*. at 59.

214.    Consequently, NOAA turned to and relied on the Forest's use of GRAIP-Lite to identify road segments at risk for sediment delivery to streams and to assess where that sediment delivery "is in relation to intrinsic steelhead potential habitat." *Id*. at 58.  NOAA also inaccurately relied on the Brown et al., 2013 study to assess the Forest's proposed mitigation measures for high sediment-producing road segments within the Project area.

215.    NOAA's reliance on the Forest's GRAIP-Lite modeling is evident from its discussion on page 59 of the BiOp:

> Road segments rated as moderate or high risk for sediment delivery were identified for all NPCNF lands in the action area. Over 70% of roads identified by NetMap as moderate or high risk will be improved under the proposed action. Within the prescription watersheds where harvest will occur, an average of 96.5% of roads identified as moderate or high risk will be improved under the proposed action. Although the GRAIP-Lite model was not calibrated, the high percentage of

identified high or moderate risk areas will be treated under the proposed action, and information gathered during road work can be used to calibrate the Net Map model for future use in the area. The NPCNF will also survey road segments not included in the proposed action but identified by NetMap as moderate or high risk. Additional actions would be identified to reduce or eliminate sediment delivery potential on those roads, if necessary.

BiOp at 59.

216.    Although NOAA said that the Forest would be checking the accuracy of NetMap at road segments in the Project area and ground-truthing moderate and high risk road segments for upgrades, there is no evidence in Project-related documents that the Forest ever called into question the GRAIP-Lite modeling outputs or that NOAA ever followed up to ensure GRAIP-Lite was properly run. *Id.* at 59-59. There is also no evidence that the Forest effectively compensated for their bad modeling outputs with on-the-ground surveys and judgment calls.

217.    When examining the Forest's proposed use of cross drains to minimize sediment delivery to streams, NOAA also relied on the Brown et al. (2013) study to conclude that "road segments with excessive lengths between water control structures and inadequate surface cover delivered the most sediment" and "[i]ncreasing the number of cross drains immediately reduces upslope drainage area that collects water, reduces erosion, and reduces hydrologic connectivity of road segments to streams." BiOp at 63. Although these conclusions are likely correct for the soil type and topography of the Virginia Piedmont, they are of questionable applicability in the Clear Creek watershed.

218.    Like the Forest, NOAA erred when it relied on the Forest's GRIAP-lite outputs and the Brown et al., 2013 study to conclude that road-related sediment within the Project area was being effectively mitigated.  This was arbitrary, capricious, and contrary to law.

**FIRST CLAIM FOR RELIEF**
**Violations of NEPA and APA**
**(Failure to take a "hard look")**

219.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

220.    This claim challenges the Forest's violation of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and implementing NEPA regulations, by failing to take a hard look at the environmental impacts of the Clear Creek Project. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

221.    Under NEPA, the Forest must take a "hard look" at the environmental impacts of any major action through a reasonably thorough discussion of the significant aspects of the probable environmental consequences and by providing adequate information about the current conditions of the environment in its Biological Assessment ("BA") and Environmental Impact Statement ("EIS"). In the case of the Clear Creek Project, the Forest failed to take the requisite hard look in numerous instances.

222.    First, the Forest failed to consider actual road width and length in its sediment model. The Forest's underestimation of road width by two-thirds in the NEZSED model and the underestimation of road length by one-third resulted in a gross underestimation of the amount of sediment being produced by roads under current conditions in the Clear Creek Project area and the amount of sediment that Project implementation will produce.

223.    Second, the Forest inflated mitigation coefficients for roads in the NEZSED model with no basis or justification. The Forest reduced Project-related sediment outputs in its NEZSED model by increasing the mitigation coefficients for roads within the Project area. In order to apply higher mitigation coefficients to roads within the Project area, the Forest changed recommended

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    62

road mitigation numbers in its guidance document for NEZSED modeling: "The Implementation Guide to Appendix A of the Nez Perce National Forest Plan." It made this change without providing any reason or justification. Such a substantive change made with no justification, let alone scientific justification, renders the Forest's NEZSED model outputs inadequate.

224.    Third, the Forest failed to use proper erosion factors for harvest units in the NEZSED model. Within its NEZSED model, the Forest assigned the wrong erosion factor to regeneration harvests removed with a skyline logging system within the Project area.  By assigning the wrong erosion factor to a great deal of the Project's harvest units, the Forest substantially underestimated harvest unit-related sediment production. This underestimation made it impossible for the Forest to take a hard look at the probable environmental consequences associated with its chosen alternative.

225.    Fourth, the Forest failed to accurately identify high sediment producing road segments and thus was not able to accurately determine where sediment mitigation measures were most needed.

226.    Fifth, the Forest failed to consider information it had in determining whether Kay Creek and South Fork Clear Creek met their Forest Plan standard for Water Quality Objectives, and hence, whether they required an upward trend analysis. PIBO data from 2012 and 2015 showed that neither stream met Forest Plan standards. Consequently, an upward trend analysis was required for the two streams.

227.    Sixth, the Forest failed to collect sufficient substrate sediment data, specifically regarding cobble embeddedness, resulting in an inability to determine whether an upward trend is occurring in Pine Knob Creek, Middle Fork Clear Creek, and Clear Creek. The data used by the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    63

Forest consisted of single data points, at various locations, in various years, and was very outdated—for Clear Creek, the Forest's data is over twenty years old. Without a sufficient set of time-series substrate data collected at the same sites using the same methodology, the Forest cannot accurately conclude that there is an upward trend occurring in the prescription watersheds.

228.    Seventh, the Forest failed to make use of the elk vulnerability model contained in the Servheen guidelines or its own 2006 Evaluation Report and therefore failed to adequately analyze how the Project would increase elk vulnerability, and thus negatively impact elk population viability in the Project area. This failure constitutes a critical omission because impacts to elk vulnerability are likely to occur as a result of this Project due to high road densities in the Project area. Consequently, the Forest failed to take a hard look at Project-related impacts to elk.

229.    The Forest's violations of NEPA are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions of the APA; and accordingly the FEIS and ROD must be held unlawful and set aside under 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF
### Violations of NEPA and APA
### (Failure to use best available science)

230.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

231.    This claim challenges the Forest's violation of the National Environmental Policy Act, 4321 et seq., and implementing NEPA regulations, by failing to use best available science in its analysis of the Clear Creek Project. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    64

232.    First, the Forest failed to supplement the incomplete road data in its INFRA database when it mapped roads in the Project area. Despite having had access to extensive Laser Light Detection and Ranging ("LIDAR") and Non System Roads Inventory ("NSRI") derived road data, the Forest failed to use either and thus underestimated the number of roads in the Hoodoo prescription watershed by approximately one-third. It is likely it also underestimated road miles in other prescription watersheds as well.

233.    Second, the Forest failed to supplement their use of the NEZSED and GRAIP-lite sediment models with full GRAIP and WEPP so that they could quantify sediment production, understand its impacts and implement effective mitigation measures. The Forest's failure to use the best available models resulted in an insufficient understanding of the volume of sediment the Project would produce, Project-related sediment impacts, and where mitigation measures were most needed.

234.    Third, the Forest failed to use its own 2006 Evaluation Report for assessing elk vulnerability associated with motorized routes in the Project area. The 2006 Evaluation Report is a model the Forest Service itself developed, and is the best available science for determining the impact of motorized routes on wildlife such as elk.

235.    The Forest's violations of NEPA are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions of the APA; and accordingly the FEIS and ROD must be held unlawful and set aside under 5 U.S.C. § 706(2).

## THIRD CLAIM FOR RELIEF
### Violations of NEPA and APA
**(Failure to notify the public of incomplete and inadequate information)**

236.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

237.    This claim challenges the Forest's violation of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and implementing NEPA regulations, by failing to disclose to the public instances where incomplete and inadequate data existed in its analysis of the Clear Creek Project. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

238.    The Forest failed to notify the public of the many instances in which it relied on incomplete and inadequate information and data in its NEPA analysis. Due to this failure, NEPA's guarantee that the relevant information regarding the Project would be made available to the public was not met. Therefore, the public was unable to effectively play its role in the decision-making process for the Clear Creek Project.

239.    The Forest's violations of NEPA are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions of the APA; and accordingly the FEIS and ROD must be held unlawful and set aside under 5 U.S.C. § 706(2).

## FOURTH CLAIM FOR RELIEF
### Violations of NFMA and APA
**(Failure to establish an upward trend in degraded watersheds)**

240.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

241.    This claim challenges the Forest Service Defendants' violations of the National Forest Management Act, 16 U.S.C. § 1601 et seq., and NFMA's implementing regulations by issuing the Clear Creek Integrated Restoration Project FEIS and ROD that are not consistent with the 1987 Forest Plan. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

242.    Under NFMA's "consistency" requirement, all agency actions, including site-specific management activities, must be consistent with the governing Forest Plan. 16 U.S.C. § 1604(i).

243.    Once a forest plan is developed, all subsequent agency actions must be consistent with that governing forest plan—in this case, the 1987 Forest Plan and its amendments.

244.    The Forest Plan for the Nez Perce National Forest includes binding standards that apply to the Clear Creek Project. The Plan requires that the Forest determine which prescription watersheds in a Project area are degraded and that the Forest complete an upward trend analysis for such watersheds.

245.    In completing the Project FEIS and ROD, the Forest violated the Forest Plan upward trend mandate by failing to collect sufficient data to reliably determine which watersheds are degraded and by failing to complete an accurate upward trend analysis for degraded watersheds.

246.    The Forest's violation of NFMA is arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions

of the APA; and accordingly the FEIS and ROD must be held unlawful and set aside under 5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF
### Violation of NFMA and APA
### (Forest's interpretation of its own mandate is plainly erroneous)

247.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

248.    This claim challenges the Forest's interpretation of its own Forest Plan rules under the National Forest Management Act, 16 U.S.C. § 1601 et seq., and NFMA's implementing regulations by plainly and erroneously deviating from a clear rule required by the applicable Nez Perce National Forest Land Restoration Management Plan ("Forest Plan"). This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

249.    A Forest's interpretation of its own Forest Plan many not be plainly erroneous or inconsistent with Forest Plan language. Further, the agency's reinterpretation is not given deference if it tends to serve as post hoc rationalization for past or current agency action that violates the apparent plain meaning requirements of the rule.

250.    The Forest's interpretation of the Forest Plan's upward trend requirement is plainly erroneous and inconsistent with the requirement because it violates the clear intent of the Forest Plan mandate. The upward trend mandate is also unambiguous as written, and the Forest's interpretation represents a post hoc rationalization.

## SIXTH CLAIM FOR RELIEF
### Violation of NFMA and APA
### (Failure to Complete Annual Monitoring Reports)

251.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    68

252.    This claim challenges the Forest Service Defendants' violations of the National Forest Management Act, 16 U.S.C. § 1601 et seq., and NFMA's implementing regulations by failing to complete annual monitoring reports as required by the 1987 Forest Plan. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

253.    Once a forest plan is developed, all subsequent agency actions must be consistent with that governing forest plan—in this case, the 1987 Forest Plan and its amendments.

254.    The Forest Service has failed to develop an annual monitoring program, to release annual monitoring reports, and to annually evaluate the results and trends from the monitoring in a separate report for the past twelve years. Such failure has precluded adequate environmental analysis of the Clear Creek Project.

255.    The Forest's violations of NFMA are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions of the APA; and accordingly the FEIS and ROD must be held unlawful and set aside under 5 U.S.C. § 706(2).

### SEVENTH CLAIM FOR RELIEF
### Violation of NFMA and APA
### (Failure to Use the Forest Plan's Elk Vulnerability Model)

256.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

257.    This claim challenges the Forest Service Defendants' violations of the National Forest Management Act, 16 U.S.C. § 1601 et seq., and NFMA's implementing regulations by failing to use the elk vulnerability model required by the 1987 Forest Plan. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                69

258.    Once a forest plan is developed, all subsequent agency actions must be consistent with that governing forest plan—in this case, the 1987 Forest Plan and its amendments.

259.    In its evaluation of the Clear Creek Project's impact on elk, the Forest Service failed to utilize the updated assumptions, rules and recommendations in the Servheen guidelines as mandated by Forest Plan Amendment No. 7.

260.    The Forest Service's violation of NFMA is arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions of the APA; and accordingly the FEIS and ROD must be held unlawful and set aside under 5 U.S.C. § 706(2).

### EIGHTH CLAIM FOR RELIEF
### Violations of ESA and APA
### (Failure to use best scientific and commercial data available)

261.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

262.    This claim for relief challenges the results of the ESA consultation over the Clear Creek Project between the Forest Service and NOAA. This claim seeks judicial review of final agency actions taken pursuant to the ESA and is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

263.    The Forest Service's BA provided to NOAA during the ESA consultations was not based on the best scientific and commercial data available, but in fact was premised on inaccurate GRAIP-Lite modeling outputs and inapplicable sediment-reduction literature.

264.    The Forest's inaccurate GRAIP-Lite modeling outputs invalidate the Forest's representations in the BA that the Forest had or would identify—using the GRAIP-Lite application

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    70

in NetMap—those road segments where sediment delivery was most problematic and conduct mitigation activities, including installing cross drains and resurfacing roads at those locations. The Forest's inaccurate GRAIP-Lite modeling outputs also invalidate the Forest's assertion in the BA that its mitigation activities would reduce long-term, chronic sediment delivery from roads to streams by at least 90 percent.

265.   The Forest also erroneously relied on the Brown, et al., 2013 study when developing its sediment mitigation measures for the Project in the BA, including installing cross drains.

266.   NOAA relied on the Forest's mischaracterizations and erroneous statements about the Project in issuing their respective BiOp/ITS for the Project, rendering the BiOp/ITC arbitrary, capricious, and contrary to law.

267.   Defendants' violations of the ESA are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions of the APA; and, accordingly, the BiOp/ITS, FEIS and ROD must be held unlawful and set aside under 5 U.S.C. § 706(2).

WHEREFORE, Plaintiff prays for relief as set forth below.

### PLAINTIFF'S PRAYER FOR RELIEF

WHEREFORE, the Tribe respectfully requests that this Court grant the following relief:

1.   Declare that the Defendants' conclusions regarding the Clear Creek Project are arbitrary, capricious, and contrary to law.

2.      Declare that the Forest Service violated NEPA by failing to take the requisite hard look at the Project's impacts to the environment, including by failing to collect sufficient current condition data, by failing to use the best available science in its analysis of the Project, and by failing to notify the public of incomplete and inadequate information used its the analysis.

3.      Declare that the Forest Service violated the National Forest Management Act ("NFMA") because the Forest failed to adhere to the requirements of the Forest Plan for the Nez Perce portion of the Nez Perce-Clearwater National Forest.

4.      Declare that NOAA's BiOp for the Project violates the ESA because NOAA failed to use the best available scientific and commercial data.

5.      Enjoin the Forest Service from implementing the Clear Creek Project until they have accurately modeled the Project's sediment production and thoroughly analyzed the Project's actual impact on spawning Habitat, the Kooskia Hatchery, and elk habitat and populations.

6.      Enjoin the Forest Service from implementing the Clear Creek Project until they complied with the 1987 Forest Plan standards, including its annual monitoring and reporting requirements, its elk vulnerability model, and its upward trend mandate.

7.      Award Plaintiff its reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., and all other applicable authorities; and/or

8.      Grant such further relief as the Court deems necessary or appropriate to redress the Defendants' legal violations and protect the public lands and resources within and surrounding the Clear Creek watershed and to protect the Kooskia Hatchery.

Dated:  July 2, 2016

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    72

DATED this 2nd day of July, 2016.

Respectfully submitted,

NEZ PERCE TRIBE
OFFICE OF LEGAL COUNSEL

By:      /s/Amanda Wright Rogerson
         /s/David J. Cummings
         *Attorneys for the Nez Perce Tribe*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 2nd day of July, 2016, I filed the foregoing **NEZ PERCE**

**TRIBE'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

electronically through the CM/ECF system, which will generate automatic service upon all

parties enrolled to receive such notice.

/s/Anjee Toothaker, Legal Assistant